# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

SHIRLEY TALIA JUSTICE Individually, and  )
on behalf of A.J., and A.L., her minor children,  )
                                      )
                Plaintiff,          )
                                        )
              v.             )      No. 1:16-cv-00584-SEB-TAB
                                        )
CHRISTOPHER JUSTICE,          )
KRISTEN LULICH,              )
JENNIFER HIGGINS,           )
JENNIFER NORRIS,             )
MONIQUE ROBERTS,           )
DIANE ELLIOTT LCSW,         )
JENNIFER BAYS BEINHART,     )
JOHN DOES 1-20,              )
                                        )
               Defendants.      )

## ORDER ON PENDING MOTIONS

This cause is before the Court on the Motion for Summary Judgment [Docket No. 64] filed on March 3, 2017, by Defendants Kristin Lulich, Jennifer Norris, and Monique Roberts (collectively "the DCS Defendants"), all of whom worked for the Department of Child Services ("DCS") during the time period relevant to this litigation. This litigation arises from events related to a long-standing custody dispute between Plaintiff Shirley Justice ("Shirley") and Christopher Justice ("Christopher") with respect to Shirley and Christopher's daughter A.J., who is autistic and non-verbal, and Shirley's daughter, A.L. Christopher and Shirley divorced in 2009 following several incidents of domestic violence. For six years, from 2008 to 2014, DCS was involved with the Justice family and investigated numerous allegations of neglect and abuse against both Shirley and

Christopher during this time period. Ultimately, in 2012, A.J. and A.L. were removed from Shirley's primary custody, pursuant to a Child in Need of Services ("CHINS") proceeding. Shirley's and Christopher's child custody battles continued through 2012 and 2013. Finally, tragically, on February 18, 2014, Christopher waited for Shirley outside of A.J. and A.L.'s daycare facility, and, when Shirley returned to the parking lot after dropping off her daughters, Christopher shot her multiple times, inflicting serious injuries.

Shirley claims in this lawsuit that, but for the actions taken by the DCS Defendants during their investigations of the abuse and neglect allegations involving A.J., Christopher would not have shot her. She has brought this action individually and on behalf of A.J. and A.L. against the DCS Defendants, pursuant to 42 U.S.C. § 1983 for alleged First Amendment, Fourth Amendment, Sixth Amendment, and Fourteenth Amendment violations as well as a claim on behalf of A.J. alleging a violation of the Americans with Disabilities Act ("ADA"), and unidentified civil rights violations under state law. For the reasons detailed below, we GRANT the DCS Defendants' Motion for Summary Judgment and REMAND to Marion Superior Court the state law claims brought against Defendants Jennifer Bays Beinart and Christopher Justice.[1]

---

[1] Plaintiff has named as defendants John Does 1-20 in her Amended Complaint. Claims against the John Doe Defendants are no longer viable at this stage as service on them was not effectuated before the two-year statute of limitations on Plaintiff's claims ran and it is now too late to amend the complaint to identify the John Doe Defendants. *See King v. One Unknown Fed. Corr. Officer*, 201 F.3d 910, 914 (7th Cir. 2000) ("We have consistently held that Rule 15(c)(3) does not provide for relation back under the circumstances, such as here, in which the plaintiff fails to identify the proper party."). Thus, in our discretion, we strike John Does 1-20 from this action. Additionally, on December 16, 2016, the Magistrate Judge ordered Plaintiff to show cause, in writing, why Defendants Christopher Justice, Jennifer Higgins, and Diane Elliott should not be

## Factual Background

### I.    General Background

Shirley and Christopher are the parents of A.J., who was born in 2007.  A.J. is a non-verbal child who was diagnosed in 2009 with a form of autism.  Shirley and Christopher divorced that same year, on March 13, 2009.  Am. Compl. ¶ 15.  After their divorce, Shirley and Christopher were granted joint legal custody of A.J.; Shirley was granted primary physical custody of their daughter.  Deposition of Shirley Justice ("S. Justice Dep.") at 13.

### II.    February 2012 Abuse Report and Investigation

On February 12, 2012, the Marion County DCS Central Intake received a report of sexual abuse that identified A.J., who was then four years old, as the victim and indicated that the perpetrator was unknown.[2]  Kristin Lulich Declaration ("Lulich Decl.") ¶ 3; Exh. 1 to Lulich Decl. ("February 2012 Form 311") at 1.  Defendant Lulich, who was then employed by DCS as a Family Case Manager, was assigned to investigate the allegations and conduct an assessment.  *Id.*

---

dismissed based on Plaintiff's failure to prosecute this action against them, given that they had not been served with the Amended Complaint in accordance with Fed. R. Civ. P. 4(m).  Plaintiff has never responded to the show cause order or provided the Court with proof of service as to Defendants Jennifer Higgins and Diane Elliott.  Accordingly, Defendants Higgins and Elliott are dismissed from this action.  Because the docket reflects that, in response to the Magistrate Judge's order, Christopher was served with the Amended Complaint and filed his Answer, he remains a defendant in this action, but only as to the state claims.

[2] From 2007 to 2011, a number of reports of domestic abuse against Christopher and a report of neglect against Shirley were filed with DCS.  While those incidents were investigated by DCS employees, none of the DCS Defendants was involved with those investigations, and thus, we do not address them further here.

The report received by DCS alleged that A.J. had been "trying to put her hands down the pants of strange men and attempt[ing] to touch their genitals." Lulich Decl. ¶ 5; February 2012 Form 311 at 3. Additionally, it was reported that A.J. had been "masturbating … at day care …." *Id.* The report further stated that Shirley had taken A.J. for an examination by the child's primary care physician and that, while there was no sign of trauma to the vaginal area, there was a bruise on A.J.'s right inner thigh. *Id.* Because of A.J.'s special needs related to her autism, it was difficult to perform any type of physical examination; thus, the report concluded that it was possible that the bruise that had been observed could have resulted from prior attempts to examine A.J. *Id.*

On the same day DCS received the report of sexual abuse, Ms. Lulich traveled to the address listed on the report to investigate the allegations, but she found no one at home. Ms. Lulich left a note with her contact information, and, on February 20, 2012, she spoke with Shirley to schedule an interview. Also on February 20, Ms. Lulich attempted to contact one of A.J.'s medical providers, but the office was closed and no message could be left. Lulich Decl. ¶¶ 6-8; February 2012 Form 311 at 4.

On February 22, 2012, Ms. Lulich spoke with forensic interviewer Jill Carr and learned that, because A.J. was non-verbal, a forensic interview could not be conducted. Lulich Decl. ¶ 9; February 2012 Form 311 at 4. Ms. Lulich spoke with Shirley the next day, on February 23, 2012, when Shirley stated that A.J.'s sexual behavior had begun only recently. Shirley indicated that she believed that Christopher's step-father, Charles Thornton, was responsible for A.J.'s behavior because A.J. would cry and run away whenever she would come in contact with him. Lulich Decl. ¶ 10; February 2012 Form

311 at 4. Later that day, Ms. Lulich observed A.L. and A.J., but could not interview either of the girls because A.L. was too young and A.J. does not speak. Lulich Decl. ¶ 11; February 2012 Form 311 at 4.

A few days later, on February 28, 2012, Ms. Lulich met with Sgt. Kinder of the Indianapolis Metropolitan Police Department ("IMPD"), who declined to accept the case. Lulich Decl. ¶ 12; February 2012 311 Form at 4. On March 5, 2012, Ms. Lulich again tried to contact one of A.J.'s medical providers and the next day was able to speak with A.J.'s doctor. Lulich Decl. ¶ 13; February 2012 Form 311 at 4. That same day, March 6, 2012, Ms. Lulich spoke with Shirley for a second time. In that conversation, Shirley stated that A.J. had drawn a picture of her family and that the individual in the drawing believed to be Mr. Thornton had been drawn with a penis. Lulich Decl. ¶ 14; February 2012 Form 311 at 4. Shirley also recounted that, although A.J. was found upon examination by her doctor to have a bruise, the bruising may have occurred as a result of A.J. being held down while the exam was completed. Shirley also stated that A.J. had been tested and was found not to have any sexually transmitted diseases or other medical conditions associated with sexual abuse. *Id.*

Ms. Lulich contacted Christopher on March 12, 2012, who indicated that he had not seen A.J. since 2011. Lulich Decl. ¶ 16; February 2012 Form 311 at 3. On March 14, 2012, Ms. Lulich spoke with Tyler Napier, A.J.'s speech-language pathologist, who indicated that A.J. had been in his office and drew what he believed to be a picture of her step-grandfather with a penis. Lulich Decl. ¶ 15; February 2012 Form 311 at 3. Ms. Lulich attempted to contact Mr. Thornton on March 14 and March 15, 2012, but was

unable to speak with him until March 19, 2012, during which conversation, Mr. Thornton stated that he had very little contact with A.J. and in fact had not had any contact with her since Christmas Eve of 2011. He further denied having engaged in any inappropriate activity with her. Lulich Decl. ¶ 17; February 2012 Form 311 at 3.

At the conclusion of her investigation, Ms. Lulich recommended that the allegation of sexual abuse be resolved as unsubstantiated because there was a lack of evidence to support its truth. Ms. Lulich's supervisor, Kathryn Connel, approved this recommendation on March 21, 2012. Lulich Decl. ¶ 18; February 2012 Form 311 at 3, 5. It was recognized that because A.J. is non-verbal, she could neither identify the perpetrator(s) nor indicate whether sexual abuse had ever occurred. Additionally, Ms. Lulich noted that both A.J. and A.L. appeared free from any marks or bruises upon examination. *Id.* Following Ms. Lulich's investigation, both Christopher and Shirley signed a Family Safety/Community Safety plan. Lulich Decl. ¶ 18.

Shirley testified by deposition that in her view the February 2012 report should have been substantiated despite the fact that a perpetrator could not be identified. S. Justice Dep. at 52-54. Specifically, Shirley testified as follows:

> Q: How can a substantiation occur when DCS doesn't know who performed the wrong act?
>
> A: Well, I thought that the substantiation was the act itself, that there was abuse going on. It shouldn't—I mean, if you know who the perpetrator is, then that makes it, of course, better because then you can take more steps to keep that person from hurting the child again. But … the abuse itself should be substantiated at the very least.
>
> Q: But what good would come from that?

A:      You know, honestly, I can't answer that for everyone ….

*Id.* at 52-53.  Shirley alleges that,[3] although Ms. Lulich stated on more than one occasion that the allegation of sexual abuse would be substantiated, it ultimately was not substantiated because DCS has a "no perp, no case" agency policy, which apparently means that if there is no identified perpetrator, the allegation will not be substantiated. Declaration of Shirley Justice ("S. Justice Decl.") ¶ 7.  Despite her disagreement with the Marion County DCS decision, Shirley did not appeal the unsubstantiation finding that was recommended by Ms. Lulich and approved by Ms. Connel.

## III.    July 2012 Abuse Report and Investigation

On July 3, 2012, another report of sexual abuse involving A.J. was made, this time to the Indiana DCS Central Intake line.[4]  A.J., who was five years old at the time, was identified as the victim and the perpetrator was unknown.  Declaration of Monique Roberts ("Roberts Decl.") ¶ 3; Exh. 1 to Roberts Decl. ("July 2012 Form 311"). Defendant Roberts, who was then a Family Case Manager for the Indiana DCS, was assigned to investigate and conduct an assessment of the allegation.  *Id.*  Defendant Norris was Ms. Roberts's supervisor at the time she received this assignment. Declaration of Jennifer Norris ("Norris Decl.") ¶ 2.

[3] Although Shirley's declaration purports to be an affidavit, her proffered statement is unsworn and does not subject her to the penalties of perjury.
[4] The July 3, 2012 report was actually the third report that was made involving A.J.  On April 24, 2012, another report involving A.J. was submitted against an unknown perpetrator.  However, none of the DCS Defendants was involved in any aspect of investigating this report, and thus, we do not address it further.  Exh. 2 to Affidavit for the Authentication of Documents ("April 2012 Form 311").

The preliminary report indicated that A.J. was autistic and non-verbal, but able to sign "more" and "all done" and use other words to request certain things. Roberts Decl. ¶ 4; Norris Decl. ¶ 4. The reporting individual recounted that while A.J. was attending speech therapy, she continually lifted up her shirt and twisted her nipple. After her session, she went into the waiting room and put pressure on her vaginal area and sang very loudly. *Id.* The report also indicated that A.J. had been touching herself and masturbating in the past and had drawn a picture of her grandfather with two legs and what appeared to be a penis. *Id.*

On July 5, 2012, Ms. Roberts spoke with Shirley on the telephone. Shirley confirmed that she was aware of the allegations and stated that she believed that A.J.'s step-grandfather, Mr. Thornton, was molesting her. Shirley told Ms. Roberts that she had to work the week of July 5th, but could meet with Ms. Roberts the following week. Roberts Decl. ¶ 7; July 2012 Form 311. On July 12, 2012, Shirley came to the DCS office and met with Ms. Roberts. During that meeting, Shirley reported that law enforcement had declined to accept the case. She also described past physical abuse that she had suffered when she was still married to Christopher, when he pulled out her hair, threw her down the stairs, and put a gun to her head and made her sit in the corner. With regard to her beliefs about Mr. Thornton, Shirley explained that she noticed that A.J. would pull away from him and showed a strong dislike for him. Shirley reiterated her previously made allegation that, when A.J. drew a picture of her family, she drew Mr. Thornton with what appeared to be a penis. Roberts Decl. ¶ 9; July 2012 Form 311.

Ms. Roberts observed A.J. at the DCS office on July 17, 2012. During that observation, A.J. did not indicated that she had been touched in an inappropriate or sexual way. Roberts Decl. ¶ 13; July 2012 Form 311. On July 18, 2012, Ms. Roberts spoke with Christopher who stated that he had never observed A.J. exhibiting the behaviors alleged. Christopher told Ms. Roberts that A.J. stays with his mother, Kathy Thornton, when A.J. is under his care and he is at work. Christopher also stated that he had no concerns with his step-father, Mr. Thornton, being around A.J. and observed that Shirley exposed A.J. to "random people." *Id.*

On August 21, 2012, Ms. Roberts spoke with Mr. Napier, a speech-language pathologist who had been treating A.J. for eleven months. Mr. Napier stated that A.J. had drawn a picture of a man with three legs and what appeared to be a penis, but that A.J. could not name any body parts. Mr. Napier further stated that A.J. had never named or identified a person who could be responsible because she is almost entirely non-verbal. Roberts Decl. ¶ 14; July 2012 Form 311. Ms. Roberts visited Shirley's home on August 24, 2012, when Shirley told Ms. Roberts that she had never left A.J. alone with any male other than her teachers. According to Shirley, she had been informed by the Applied Behavior Center for Autism ("ABC") staff that A.J.'s behaviors were learned behaviors. Shirley also informed Ms. Roberts that A.J. had two physical examinations and cultures taken, but there was no evidence of trauma found. Roberts Decl. ¶ 15; July 2012 Form 311.

On September 7, 2012, Ms. Roberts spoke with Kathy Thornton, Christopher's mother. Mrs. Thornton told Ms. Roberts that because Christopher and Shirley had

longstanding difficulties in their relationship, she had only begun seeing A.J. over the summer, and that prior to that she had not seen A.J. since 2011. Because of the conflicts between Christopher and Shirley, Mrs. Thornton was court-ordered to assist with pick-ups and drop-offs with respect to A.J. Mrs. Thornton expressed concern regarding the people Shirley allowed to be around A.J. and referenced Shirley's having moved a lot from one house to another. According to Mrs. Thornton, A.J. and Mr. Thornton had a good relationship and A.J. never appeared to be frightened of him. Mrs. Thornton indicated that she had never witnessed anyone touching A.J. inappropriately nor had she witnessed A.J. engage in the complained of behaviors, though she noted that A.J. scratched herself frequently because she had sensitive skin. Roberts Decl. ¶ 19; July 2012 Form 311. Ms. Roberts spoke with Mr. Thornton on September 10, 2012, who stated that, when A.J. visited their home, Mrs. Thornton was the primary caregiver and that he had never noticed any sexual behaviors by A.J. Roberts Decl. ¶ 20; July 2012 Form 311.

On September 14, 2012, Ms. Roberts recommended that the allegation of sexual abuse be ruled unsubstantiated because there was a lack of evidence to establish that the allegation was true. Ultimately, Ms. Roberts concluded that, although people connected with the ABC Center for Autism and Easter Seals Crossroads had indicated concerns, there was insufficient evidence to show that A.J. was sexually abused, particularly because, since A.J. is non-verbal, she could not identify a perpetrator or even report whether sexual abuse had in fact occurred. Roberts Decl. ¶ 21; July 21 Form 311.

## IV.    2012 Contact with Government Officials

According to Shirley, she made several attempts in July 2012 to contact government officials, including former Governor Mitch Daniels, former Lieutenant Governor Becky Skillman, and various other state legislators, regarding the need to amend the statute defining what constitutes a preponderance of evidence standard sufficient to support abuse allegations when such evidence pertains to children with special needs and persons with no autonomy. S. Justice Decl. ¶ 11; Exh. A to S. Justice Decl. Shirley alleges that she also had contacted Dan Ward at the Indiana Protection and Advocacy Services Center seeking their assistance in filing a complaint against the DCS for discrimination as well as against DCS Director James Payne and other supervisors at DCS regarding A.J.'s case and imploring them for help. Am. Compl. ¶¶ 23, 29-31. According to Shirley, on August 9, 2012, she received a voicemail message from Austin Highbaugh, Division Manager at DCS, and again, on August 22, 2012, when Mr. Highbaugh informed her that he was having a meeting that day with Shirley's case manager and her supervisor. However, Shirley is not aware whether Ms. Lulich, Ms. Roberts, and Ms. Norris were made aware of these communications. S. Justice Dep. at 62, 79, 88-89.

## V.       September 6, 2012 Abuse Report and Investigation

On September 6, 2012, Indiana DCS Central Intake received another allegation of sexual abuse involving five-year-old A.J. after she tested positive for chlamydia in both her vaginal and anal areas. The perpetrator was identified in the report as "unknown grandfather." Roberts Decl. ¶¶ 24-25; Exh. 3 to Roberts Decl. ("September 2012 Form 311"); Norris Decl. ¶¶ 10-11.

Ms. Roberts spoke with Shirley on the telephone that same day, when Shirley stated that she was informed by A.J.'s school that A.J. had been holding and rubbing her abdomen and walking with her legs apart. Shirley repeatedly told Ms. Roberts that the only men she allowed around A.J. were Christopher and Mr. Thornton. Roberts Decl. ¶ 25; September 2012 Form 311. Ms. Roberts spoke with Shirley by telephone again on September 10, 2012, informing her that she would be coming to Shirley's home the following day and needed to speak to a man named Marcell Tishner with whom Ms. Roberts had seen Shirley on two prior occasions. Shirley said that Mr. Tishner would be there. Shirley also told Ms. Roberts that, on September 6, 2012, she had taken A.J. to the hospital and A.J. had to be sedated so that doctors could examine her, but nothing was found at that time. Roberts Decl. ¶ 27; September 2012 Form 311. That same day, Ms. Roberts observed A.J. and A.L. in their home, who reported that A.J. appeared healthy, but non-expressive because she is non-verbal. Roberts Decl. ¶ 28; September 2012 Form 311.

On that same day, September 10, 2012, Ms. Roberts spoke with Christopher, who stated that he was very concerned for A.J. when she was in Shirley's care. He agreed to be present at a child and family team meeting scheduled for September 12, 2012. Roberts Decl. ¶ 29; September 2012 Form 311.

On September 11, 2012, Ms. Roberts received a message from a man named Courtney Robinson who stated that he was calling at the request of Shirley Justice because he had heard that Ms. Roberts wanted to speak with him. Mr. Robinson said that Shirley had told Ms. Roberts that his name was actually Marcell Tishner. Roberts Decl. ¶

30; September 2012 Form 311. After speaking with Mr. Robinson, Ms. Roberts went to Shirley's home to speak with her. Shirley told Ms. Roberts that Marcell Tishner had stopped taking her telephone calls and that she was not able to get him to contact Roberts. Shirley further stated that she had known Mr. Tishner for approximately two years and that he was a friend who would do odd jobs around the house and occasionally provide her with transportation. According to Shirley, Mr. Tishner had been around A.J. and A.L. no more than six or seven times and was never alone with the girls. Roberts Decl. ¶ 31; September 2012 Form 311.

Ms. Roberts then asked Shirley about a man named Courtney who also allegedly had been around A.J. and A.L. Shirley stated that she had not seen Courtney since 2009. Shirley reported that she had another male friend, John McGuffey, but that he had never been alone with A.J. and A.L. Ms. Roberts also inquired about a former roommate of Shirley's who was alleged to be a prostitute who had used Shirley's home for illicit purposes. Shirley stated that her former roommate had asked permission to use the house because a man had offered to pay the roommate for sex, but that Shirley had declined to allow her to use the house for that purpose. Roberts Decl. ¶ 32; September 2012 Form 311.

A child and family team meeting was held at the DCS office on September 12, 2012. Shirley, Christopher, Ms. Roberts, Ms. Norris, Ms. Thornton, Mr. Thornton, Kyle Quinn and Carolyn Dickmeyer from the ABC Center for Autism, Karrie Veteo and Tyler Napier from Easterseals Crossroads, and Barbie Mulraney, a Registered Nurse from the Child Protection Team, were all in attendance. At the meeting, all caregivers agreed to

13

be medically tested for sexually transmitted diseases and agreed to sign a release of information for medical records. Roberts Decl. ¶ 33; Norris Decl. ¶ 12; September 2012 Form 311; Exh. 4 to Roberts Decl. ("Medical Releases"). Shirley was asked to provide the names of all the men she had permitted to be around her daughters; she identified Marcel Tishner, John McGuffey, and Josh Cohen. Christopher reported that there was also a man named Courtney, who was supposedly A.L.'s father, but Shirley denied this. Roberts Decl. ¶ 34; September 2012 Form 311.

Following this meeting, Shirley indicated that she was not happy with the manner in which the meeting had been conducted and refused to speak with Ms. Roberts or Ms. Norris further. Thereafter, Shirley ceased cooperating with Ms. Roberts. When Ms. Roberts attempted to obtain test results from Shirley's doctor, she discovered that the doctor Shirley had identified on her medical release had retired in December 2011. The doctor's former staff informed Ms. Roberts that Shirley had not recently been in the office for any type of lab work. When Ms. Roberts attempted to contact Shirley, she (Shirley) refused to bring A.L. in for a forensic interview that was scheduled for September 19, 2012. Roberts Decl. ¶ 35; September 2012 Form 311.

Ms. Roberts spoke with Courtney Robinson in his home on September 14, 2012, during which Mr. Robinson stated that "Marcell" was his middle name and that "Tishner" was his mother's last name. He told Ms. Roberts that Shirley wanted him to say that his name was Marcell Tishner to "leave him out of the equation." Roberts Decl. ¶ 36; September 2012 Form 311. According to Mr. Robinson, there had been multiple men around A.L. and A.J. when they were in Shirley's care, and Shirley had told him that she

14

intended to provide evidence so that DCS would substantiate an abuse allegation against Christopher or Mr. Thornton in order to gain full custody of A.J., move out of state. *Id.*

On September 14, 2012, Christopher tested negative for chlamydia. Roberts Decl. ¶ 37; September 2012 Form 311. On September 17, 2012, DCS received medical records and test results for both Ms. Thornton and Mr. Thornton, both of whom tested negative for chlamydia. Roberts Decl. ¶¶ 38-39; Norris Decl. ¶¶ 16-17; September 2012 Form 311.

Ms. Norris and Ms. Roberts met with Shirley on September 20, 2012 to discuss the men with whom she associated. When asked about Marcell Tishner, Shirley stated that he was a friend who was a completely different person than Courtney Robinson. However, when Ms. Roberts and Ms. Norris informed her that they knew that Courtney Robinson and Marcell Tishner were the same person, Shirley recanted her story and said she had to lie about Mr. Robinson's real name because he had a "DCS history." Roberts Decl. ¶ 41; Norris Decl. ¶ 18; September 2012 Form 311. Shirley reported that Mr. Robinson had been staying with her for three weeks. She further reported that she had gone to Planned Parenthood to get tested for sexually transmitted diseases, but she had disclosed at the September 11 team meeting that she would go to that facility for the testing. *Id.*

On September 20, 2012, DCS released A.J. and A.L. to the custody of Christopher. Shirley was informed of this decision and of her legal rights. Roberts Decl. ¶ 42; Norris Decl. ¶ 19; September 2012 Form 311. Ms. Roberts subsequently prepared and signed a Verified Petition Alleging Children to Be in Need of Services that was filed

in the CHIN proceedings.  Roberts Decl. ¶ 43; Exh. 5 to Roberts Decl. ("Verified Petition Alleging Children to Be in Need of Services").  On September 21, 2012, the Marion Superior Court, Juvenile Division issued its Order to File CHINS Petition.  Dkt. 66-18 ("Order to File CHINS Petition").  Ms. Roberts then prepared and signed the Intake Officer's Report of Preliminary Inquiry and Investigation for the initial detention hearing in the CHINS proceedings.  Roberts Decl. ¶ 44; Exh. 6 to Roberts Decl. ("Intake Officer's Report of Preliminary Inquiry and Investigation").  Shirley and Christopher appeared in person at the September 21, 2012 initial detention hearing in Marion Superior Court, during which the court found that the removal of A.J. and A.L. was necessary to protect them and granted wardship to DCS.  Dkt. 66-19 ("Order Regarding CHINS Initial Detention Hearing").

On September 26, 2012, during a supervised visit, Shirley and the visitation facilitator both noticed a thumbprint-like bruise on A.J.'s inner thigh.  The facilitator took photographs and indicated that she would send them to a DCS case manager.  Shirley's visits with A.J. had been supervised during this period of time.  S. Justice Decl. ¶ 27; Exh. F to S. Justice Decl.

On October 10, 2012, Ms. Roberts recommended a substantiation of neglect due to several factors, including a finding that a preponderance of the evidence that Shirley had provided DCS was false and inaccurate information concerning doctors, telephone numbers, household members, and individuals' names; that she had failed to submit to sexually transmitted disease testing until October 4, 2012; and that she demonstrated an inability to ensure the safety of A.J. and A.L. by being untruthful about the men with

access to her daughters, given that A.J. had contracted chlamydia while in her custody. September 2012 Form 311 at 5-6. Ms. Roberts also recommended that the neglect allegation as to Mr. Thornton was unsubstantiated based on the fact that he tested negative for sexually transmitted diseases and his medical records shown no history of having chlamydia. *Id.* at 6. Mr. Norris approved these recommendations on October 16, 2012. *Id.* After October 2012, neither Ms. Roberts nor Ms. Norris conducted any further investigation with respect to Shirley, A.J., and A.L. Roberts Decl. ¶ 48; Norris Decl. ¶ 24.

## VI.     October 21, 2012 Abuse Report

Five days later, on October 21, 2012, Shirley called the Child Protective Services hotline to report abuse and neglect by Courtney Robinson and Christopher against A.J. and A.L. Shirley reported the bruising on A.J.'s inner thighs as well as safety concerns regarding A.L. with Mr. Robinson. The report states: "Reports have been made to the Ombudsman, the governor, the supervisors, Director Payne, etc., regarding Marion County investigators." Exh. G to S. Justice Decl. ("October 21, 2012 Report").

None of the DCS Defendants was assigned to investigate or supervise the investigation of this report. However, on October 24, 2012, Ms. Norris sent emails to a number of the DCS employees who had been assigned to the investigation, stating as follows:

> Shirley filed 2 reports. One on each dad for abuse and neglect. They are attached. Alice Houston in Nicole Holder's unit is the current [Family Case Manager]. I just wanted to make sure you are all aware of this. I cannot be more excited that this did NOT come to my team, but if anyone

needs anything from myself or [Ms. Roberts] we are experts on this
family!!

Exh. I to S. Justice Decl.

## VII.    January 30, 2013 Abuse Report and Investigation

On January 30, 2013, DCS Central Intake received another report alleging abuse

as to A.J., but this time, Shirley was alleged to be the perpetrator.  Lulich Decl. 19; Exh.

2 to Lulich Decl. ("January 2013 Form 311").  Shirley's primary care physician had

received a telephone call from Shirley requesting an appointment for an exam of A.J.

because Shirley alleged that A.J. had a discharge in her underwear and Shirley had

concerns of sexual abuse.  The physicians involved found no reason for an examination,

so they cancelled the appointment that Shirley had made.  Shirley then took A.J. to the

emergency room and demanded that she be seen.  Emergency room staff indicated that

they could not examine A.J., but Shirley demanded a cup to collect a urine sample from

A.J. because she was concerned that A.J. had again contracted chlamydia.  Shirley then

took A.J. into the restroom to collect a urine sample.  However, the sample cup fell in the

toilet and, as a result, the medical staff refused to accept the sample.  Lulich Decl. ¶ 20;

January 2013 Form 311.

Ms. Lulich spoke with Christopher on January 31, 2013.  Christopher was aware

that the report had been made and was concerned about Shirley's continued sexual abuse

accusations and the exposure of A.J. to unnecessary and invasive medical examinations.

Lulich Decl. ¶ 21; January 2013 Form 311.  On Feburary 5, 2013, Ms. Lulich spoke with

another member of the Child Protection Team.  Physicians agreed to examine A.J., but

only for marks and bruises. Ms. Lulich was informed that the examination of A.J. revealed no injuries. Lulich Decl. ¶ 22; January 2013 Form 311.

On February 11, 2013, Ms. Lulich again spoke with Christopher who indicated that he was experiencing great difficulty with Shirley because she was continuing to make accusations against him and other members of his family. He indicated that he and his family members had been tested for sexually transmitted diseases immediately after A.J. contracted chlamydia in 2012, and the results were all negative. He recounted that he had spoken with individuals at Eagle View Kindercare, A.J.'s daycare and schooling facility, who reported their concerns about Shirley's attempts to take staff to the bathroom with A.J. to show them bruises and vaginal discharge. Lulich Decl. ¶ 23; January 2013 Form 311. Ms. Lulich observed A.J. that same day, who gave no signs of marks, bruises, cuts, or welts. Lulich Decl. ¶ 24; January 2013 Form 311.

On February 12, 2013, Ms. Lulich spoke with a member of the Child Protection Team who informed her that A.J.'s physicians had agreed to contact each other if Shirley attempted to schedule another appointment for A.J. to undergo a sexual abuse examination. Lulich Decl. ¶ 25; January 2013 Form 311.

Ms. Lulich spoke with Shirley in her home on March 7, 2013 and informed her of the allegations against her. Shirley responded that A.J. was taken to the hospital due to concerns about discharge in her underwear. According to Shirley, ever since her daughters had been removed from her care, she noticed bruising when she had visitation; she made an appointment after noticing the bruising, but upon examination at the hospital, no bruises were ever found. Shirley acknowledged that she wanted A.J. tested

for sexually transmitted diseases but that the medical providers refused to do so. Shirley further reported that A.J. had begun "masturbating" again and "[screaming] and [punching] herself in the stomach." Lulich Decl. ¶ 27; January 2013 Form 311.

On March 8, 2013, Ms. Lulich followed up with the Child Protection Team. Although no additional medical appointments had been made by Shirley, one medical provider remained concerned about medical abuse because symptoms that had been observed by Shirley were not detected by anyone else, including medical staff. Lulich Decl. ¶ 29; January 2013 Form 311.

Ms. Lulich recommended that the allegations of abuse against Shirley be substantiated in light of the evidence discovered. The evidence considered by Ms. Lulich in making this recommendation included, *inter alia*, the numerous, repeated appointments for unnecessary medical procedures, such as rape exams, where A.J. had to be restrained and sedated due to her screaming and her lack of understanding of the circumstances of the examinations. Lulich Decl. ¶ 30; January 2013 Form 311. Ms. Lulich's recommendation was approved by her supervisor, Kathryn Connel, on April 4, 2013, and a notice of assessment was mailed to Shirley upon the closing of the assessment. Lulich Decl. ¶ 31; Exh. 3 to Lulich Decl. ("Notice of Assessment"). Shirley and Christopher both signed a Family Safety Community Safety Plan with respect to the

allegation. Lulich Decl. ¶ 31; January 2013 Form 311. After April 4, 2013, Ms. Lulich had no further involvement with Shirley, A.J., and A.L.[5] Lulich Decl. ¶ 35.

Shirley contends that she was not originally aware of the medical abuse allegation against her, despite having been interviewed about it in her home. S. Justice Dep. at 125. According to Shirley, she ultimately learned of the substantiation of the allegation on November 8, 2013, at a custody modification hearing. *Id.* at 129.

## VII. 2014 to the Present

On February 8, 2014, using a firearm, Christopher shot Shirley multiple times outside A.J. and A.L.'s daycare in Indianapolis, Indiana, causing serious injuries. After Shirley was shot, following a detention hearing, A.J. and A.L. were made wards of the State of Indiana. S. Justice Dep. at 33; Dkt. 66-20 ("February 20, 2014 Order"). Shirley testified that she believes this decision was proper. S. Justice Dep. at 33-34. A.J. is currently placed with Mr. and Mrs. Thornton, and A.L. currently lives with Shirley's friend, Rachel Wiggins. *Id.* at 26, 29. A.J. and A.L. are now wards of the State of Indiana, but DCS is recommending that A.J. and A.L. be reunified with Shirley. *Id.* at 27.

## VIII. The Instant Litigation

Shirley filed her original complaint in this action on February 10, 2016, in Marion Superior Court. The case was removed to this Court on March 16, 2016. Shirley filed an

---

[5] On September 8, 2013, another allegation of sexual abuse involving A.J. was made to DCS. However, none of the DCS Defendants investigated the allegation or supervised the investigation. Accordingly, we do not address that allegation further here.

amended complaint on April 12, 2016, alleging various federal and state law claims

against the DCS Defendants, including claims brought pursuant to § 1983 for alleged

First, Fourth, Sixth, and Fourteenth Amendment violations, a discrimination claim

brought pursuant to Title II of the ADA, and state law conspiracy, defamation, and

"injuries" claims.  The summary judgment motion filed by the DCS Defendants is fully

briefed and ripe for ruling.

## Legal Analysis

### I.      Standard of Review

Summary judgment is appropriate where there are no genuine disputes of material

fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for

summary judgment if it appears that no reasonable trier of fact could find in favor of the

nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate

the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences

flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*,

573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

### II.     Section 1983 Claims Against the DCS Defendants

#### A.      Sixth Amendment and Equal Protection Claims

Plaintiff's claims alleging violations of the Sixth Amendment and the Equal

Protection Clause of the Fourteenth Amendment can be dispatched with in short order as

Plaintiff failed to put forth any developed argument supported by any relevant case law as

to either claim in her response in opposition to the DCS Defendants' summary judgment motion. It is well-established under Seventh Circuit law that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)." *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991). Accordingly, the DCS Defendants are entitled to summary judgment as to Plaintiff's § 1983 claims based on alleged violations of the Sixth Amendment and the Fourteenth Amendment's Equal Protection Clause.

### B. First Amendment Claim

Shirley next alleges that, in violation of the First Amendment, the DCS Defendants retaliated against her in 2012 and 2013 by substantiating claims of abuse against her and causing her children to be removed from her custody, shortly after she contacted various elected representatives via email seeking an amendment to an Indiana statute addressing the burden of proof applicable to abuse allegations pertaining to children with special needs. However, this claim is barred by the applicable statute of limitations.

Although § 1983 does not explicitly provide a limitations period, it is well-established under Seventh Circuit case law that the appropriate limitations period for claims brought pursuant to § 1983 is "the statute of limitations for personal injury claims of the state where the alleged injury occurred." *Brademas v. Ind. Housing Fin. Authority*, 354 F.3d 681, 685 (7th Cir. 2004). In Indiana, personal injury claims must be commenced within two years after the action accrues. Ind. Code § 34-11-2-4. Thus, the statute of limitations applicable to all of Plaintiff's § 1983 claims is two years.

23

Here, Plaintiff filed her complaint on February 10, 2016. Thus, any cause of action which accrued before February 10, 2014 is time-barred. It is undisputed that the latest point at which Defendants Norris and Roberts had any involvement with Shirley that could form the basis of a First Amendment retaliation claim was the October 2012 CHINS proceeding, more than two years before her complaint was filed. Shirley was clearly aware by September 21, 2012 of the actions taken by Norris and Roberts, having attended the initial hearing in the CHINS proceeding on that date. Likewise, the latest involvement Defendant Lulich had with Shirley that could form the basis of a retaliation claim was the April 2013 investigation and eventual substantiation of medical abuse allegations against Shirley. Although there is some dispute as to the exact date that Shirley became aware of that action, Shirley testified by deposition that she learned of the medical abuse substantiation on November 8, 2013, when she attended a custody modification hearing. Thus, the undisputed facts establish that the latest any First Amendment retaliation claim accrued against the DCS Defendants was November 8, 2013, more than two years before Plaintiff's complaint was filed. Shirley's First Amendment retaliation claim is therefore time-barred and the DCS Defendants are entitled to summary judgment on this ground.

### C. Fourth Amendment Claims

Plaintiff alleges that the DCS Defendants' September 2012 detention and removal of A.L. and February 2014 seizure of both A.L. and A.J. after Christopher shot and seriously injured her violated her daughters' rights guaranteed by the Fourth Amendment to be free from unreasonable seizures. It is well-established, again under Seventh Circuit

case law, that "seizure alone is not enough for § 1983 liability; the seizure must be

unreasonable." *Brokaw v. Mercer County*, 235 F.3d 1000, 1010 (7th Cir. 2000) (internal

quotation marks and citation omitted). "In the context of removing a child from his home

and family, a seizure is reasonable if it is pursuant to a court order, if it is supported by

probable cause, or if it is justified by exigent circumstances …." *Id.*

Here, on September 21, 2012, the juvenile court found sufficient evidence to

support a finding of probable cause that both A.J. and A.L. were children in need of

services and that detention was necessary to protect them. Order Regarding CHINS

Initial Detention Hearing at 4. Because Plaintiff's Fourth Amendment claim as it relates

to the September 2012 abuse report and subsequent CHINS proceeding can succeed only

if no probable cause existed, we must determine whether the juvenile court's probable

cause finding is entitled to preclusive effect, thus barring Plaintiff from relitigating the

issue. "Issue preclusion prevents a party from relitigating an issue that it has previously

litigated and lost." *Jensen v. Foley*, 295 F.3d 745, 748 (7th Cir. 2002). "Federal courts

must give state court judgments the same preclusive effect as would a court in the

rendering state." *Id.* (internal quotation marks and citation omitted).

In Indiana, "issue preclusion bars subsequent litigation of the same fact or issue

that was necessarily adjudicated in a former suit." *Miller Brewing Co. v. Ind. Dep't of

State Revenue*, 903 N.E.2d 64, 68 (Ind. 2009). "In determining whether issue preclusion

is applicable, a court must engage in a two-part analysis: (1) whether the party in the

prior action had a full and fair opportunity to litigate the issue and (2) whether it is

otherwise unfair to apply issue preclusion given the facts of the particular case."
*Angelopoulos v. Angelopoulos*, 2 N.E.3d 688, 696 (Ind. Ct. App. 2013).

It is clear here that Plaintiff had a full and fair opportunity to litigate the issue of probable cause at the September 21, 2012 detention hearing. Shirley was present at the hearing and gave a statement to the juvenile court. Additionally, once the determination of probable cause was made by the juvenile court, she had the opportunity to appeal the juvenile court's order, if she chose to do so. It is also undisputed that the juvenile court's determination of probable cause was controlling and material to the detention order. *See* Ind. Code § 31-34-2-3. Accordingly, the first prong of the analysis is satisfied.

Plaintiff's only argument as to why issue preclusion would be otherwise unfair to apply here is her allegation that "the DCS Defendants failed to advise the CHINS Court that they had skewed the perception of the DCS team and the service providers by labeling Shirley Justice as a sociopath, manipulative, and sneaky …."[6] Pls.' Resp. at 22–23. We are not persuaded by this argument. Plaintiff does not claim that the DCS Defendants affirmatively misrepresented any facts on which the juvenile court's probable

---

[6] This language comes from an email string among DCS workers, dated September 19, 2012, in which Defendant Norris refers to Shirley as being "manipulative" and "a sociopath" and what appears to be an October 2012 service provider referral completed by an unidentified DCS employee that describes Shirley as "sneaky and manipulative." Exh. B, Exh. C to S. Justice Decl. The DCS Defendants argue that the exhibit containing the email string cited by Plaintiff is unauthenticated and incomplete, pointing to the fact that at least one email message in the string is cut off in the exhibit proffered by Plaintiff. The DCS Defendants further assert that the emails originate from a G-mail account not used by them. For these reasons, the DCS Defendants maintain that Plaintiff's exhibit is inadmissible. Similarly, the provider referral included in Plaintiff's evidence designation is also incomplete, with only "Page # 2 of 2" submitted. Because our consideration of the statements does not ultimately alter our analysis, we need not address this issue further.

cause determination was based.  The DCS Defendants' unfavorable assessment of Shirley's behaviors and character, even if shared with the juvenile court, would not have undermined the credibility of the facts presented to the court establishing probable cause, including that A.J. had tested positive for chlamydia and Shirley was "unable to provide a plausible explanation for her daughter's sexually transmitted disease."  Order Regarding CHINS Initial Detention Hearing at 4.  Accordingly, reviewing the facts particular to this case, we find no reason to conclude that it is unfair to apply issue preclusion under these circumstances.

Because the juvenile court's finding of probable cause is entitled to preclusive effect, Plaintiff is not entitled to relitigate that determination in this forum.  Accordingly, we do not consider the merits of Plaintiff's Fourth Amendment claim as it relates to the September 2012 detention and removal of A.L., given the juvenile court's finding that sufficient evidence supported a probable cause finding that both A.J. and A.L. were Children in Need of Services and that detention was necessary to protect them.  *Id.*

With regard to Plaintiff's claim that the seizure of A.J. and A.L. following the February 2014 shooting violated her daughter's Fourth Amendment rights, it is undisputed that none of the DCS Defendants was involved with that seizure. Accordingly, none can be held liable for any Fourth Amendment violation (if any) associated with the DCS's handling of the situation following the February 2014 shooting.  The DCS Defendants are thus entitled to summary judgment on Plaintiff's Fourth Amendment claims.

### D.      Due Process Claims

### 1.     Substantive Due Process Claims

Although it is not entirely clear from their briefing, we understand Plaintiff to be making three substantive due process arguments.  First, that Shirley's and her daughters' right to family integrity, a component of substantive due process, was violated by the September 2012 removal of A.J. and A.L. from Shirley's custody; second, that Shirley's substantive due process rights were violated when the DCS Defendants substantiated abuse allegations against her in January 2013; and finally, that A.J.'s substantive due process rights were violated when the DCS Defendants failed to substantiate abuse allegations where she was the victim in February and July 2012.  We address these claims in turn.

First, the right to familial integrity, which encompasses "the right of a man and woman … to bear and raise their children" and "the right of a child to be raised and nurtured by his parents," *Doe v. Heck*, 327 F.3d 492, 517–18 (7th Cir. 2003), is not absolute; it is "limited by the compelling governmental interest in the protection of children particularly where the children need to be protected by their own parents." *Brokaw*, 235 F.3d at 1018 (internal quotation marks and citation omitted).  Thus, the fundamental right to familial relations must be balanced with the government's interest in protecting children from abuse or neglect.  *Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 928 (7th Cir. 2011).  "To maintain the appropriate balance, we require that caseworkers have evidence to support a reasonable suspicion of past or imminent abuse before they may take a child into protective custody."  *Id.* (internal quotation marks and citation omitted).  "A reasonable suspicion requires more than a hunch but less than

probable cause." *Id.* As discussed above, the juvenile court found that probable cause existed to support the September 2012 removal of the children from Shirley's custody. Because we must give that determination preclusive effect, the juvenile court's probable cause finding is dispositive of Plaintiff's substantive due process claim based on A.J. and A.L.'s September 2012 removal.

Plaintiff's substantive due process claims based on the January 2013 substantiation of abuse allegations against Shirley and the DCS Defendants' failure to substantiate allegations of abuse in February 2012 and July 2012 where A.J. was the victim also fail because Plaintiff has not identified any constitutionally protected interest of which she or the children were deprived as a result of these actions. Plaintiff has not cited and we have not found any authority holding that an individual has a constitutionally protected interest in having a child abuse claim substantiated against a third party. Likewise, Plaintiff has failed to articulate a constitutionally protected interest implicated by Shirley's medical abuse substantiation claim. Injury to reputation, without more, is not a cognizable constitutional injury and Plaintiff has put forth no argument as to any other legal status or right of which she was deprived as a result of the medical abuse substantiation. *See Paul v. Davis*, 424 U.S. 693, 711–12 (1976) ("[A]ny harm or injury to [one's reputation], even where … inflicted by an officer of the State, does not result in a deprivation of any 'liberty' or 'property' recognized by state or federal law, nor has it worked any change of respondent's status as theretofore recognized under the State's laws."). As noted above, "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)."

*Berkowitz*, 927 F.2d at 1384.  For these reasons, the DCS Defendants are entitled to summary judgment as to Plaintiff's substantive due process claims.

## 2. Procedural Due Process

Again, although not entirely clear from their briefing, we understand Plaintiff to be bringing procedural due process claims against the DCS Defendants on the ground that the DCS Defendants affirmatively misrepresented facts in order to seize and detain A.J. and A.L. in September 2012 and February 2014, which denied Plaintiff and her daughters even the minimum process expected and required under federal law.[7]  It is true that the Seventh Circuit has recognized in the context of child removal cases that "no matter how much process is required, at a minimum it requires that government officials not misrepresent the facts in order to obtain the removal of a child from his parents." *Brokaw*, 235 F.3d at 1020.  Here, however, Plaintiff has failed to identify any facts that the DCS Defendants misrepresented.  With regard to the September 2012 removal of A.J. and A.L., Plaintiff does not cite to any part of the CHINS hearing transcript establishing that the DCS Defendants testified in any way contrary to the evidence that A.J. had been diagnosed with chlamydia and that Shirley was unable to explain how A.J. could have contracted the sexually transmitted disease while in her care.  Although Plaintiff again

---

[7] To the extent Plaintiff is also bringing procedural due process claims based on the January 2013 medical abuse substantiation against Shirley and the DCS Defendants' failure to substantiate medical abuse allegations where A.J. was the victim in February and July 2012, those claims fail because, as detailed above, Plaintiff has not put forth developed argument as to the constitutional interests implicated.  *See Brokaw*, 235 F.3d at 1020 ("[A] procedural due process claim involves a two-part analysis: First, we determine whether the defendants deprived the plaintiff of a protected liberty or property interest, and if so, then we assess what process was due.").

takes issue with Ms. Norris's characterization of her as "manipulative," "sneaky," and "a sociopath," as discussed above, this unfavorable view of Shirley is not an affirmative misrepresentation of facts. Because Plaintiff has come forth with no evidence to establish that any of the DCS Defendants falsely testified in order to seize and detain the children and does not argue that any other process she and her daughters were afforded before A.J. and A.L. were removed from Shirley's custody in 2012 was constitutionally deficient, her procedural due process claim based on the September 2012 removal cannot survive summary judgment.

Plaintiff further claims that she and her daughters were denied procedural due process when, "[p]rior to deeming the children CHINS in February 2014, the DCS Defendants failed to provide the Court with information that while Shirley Justice was in a hospital, her family was ready, willing and able to speak on her behalf and take custody of A.L. and A.J." Pls.' Resp. at 24. However, the undisputed evidence establishes that none of the DCS Defendants was in any way involved with the Justice family's case after April 2013. Accordingly, none of them can be held liable for any alleged mishandling of the case following the February 2014 shooting. For these reasons, the DCS Defendants are entitled to summary judgment on Plaintiff's procedural due process claims.

## III.    ADA Claim Against the DCS Defendants

Plaintiff next argues that the DCS Defendants discriminated against A.J. in violation of the ADA by refusing to substantiate sexual abuse allegations prior to her chlamydia diagnosis in September 2012, because, as a result of her disability, A.J. was non-verbal and thus could not identify the perpetrator of the abuse. Title II of the ADA

31

provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "To establish a violation of Title II of the ADA, the plaintiff must prove that [s]he is a qualified individual with a disability, that [s]he was denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was by reason of [her] disability." *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (internal quotation marks and citations omitted).

Additionally, in order to recover compensatory damages under Title II of the ADA, Plaintiff must prove intentional discrimination. *See Love v. Westville Correctional Ctr.*, 103 F.3d 558, 560–61 (7th Cir. 1996). Our sister circuits are split on the applicable standard for showing intentional discrimination, with the minority of circuits suggesting discriminatory animus as the proper standard and the majority applying a deliberate indifference standard. *Compare Carmona-Rivera v. Puerto Rico*, 464 F.3d 14, 18 (2006), *and Delano-Pyle v. Victoria County, Tex.*, 302 F.3d 567, 575 (5th Cir. 2002) (discriminatory animus), *with S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 262-64 (3d Cir. 2013), *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 348 (11th Cir. 2012), *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011), *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009), *Mark H. v. Lemahieu*, 513 F.3d 922, 938 (9th Cir. 2008), *and Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999) (deliberate indifference). The Seventh Circuit "has yet

to decide whether discriminatory animus or deliberate indifference is required to show intentional discrimination." *Strominger v. Brock*, 592 Fed. App'x 508, 511 (7th Cir. 2014).

Here, Plaintiff's claim fails because no evidence has been adduced sufficient to show, either under the discriminatory animus standard or the deliberate difference standard, that any unsubstantiation of abuse was the result of intentional discrimination against A.J. *because of her disability* as opposed to simply a lack of evidence to substantiate the allegations of abuse at that time, given that A.J. could neither identify a perpetrator nor confirm that abuse had occurred. Plaintiff makes much of the DCS's alleged "no perp, no case," policy, but the evidence does not support the conclusion that such a policy, even if it existed, was applied against A.J. to intentionally discriminate against her because of her disability. In fact, the evidence directly pushes against that conclusion, given that, although the perpetrator of the sexual abuse against A.J. has never been identified, once A.J. was diagnosed with chlamydia in September 2012, the DCS substantiated the sexual abuse allegations without requiring such an identification. Thus, Plaintiff's argument does not hold water. Although Plaintiff may disagree with the DCS Defendants' assessment as to what constitutes sufficient evidence to substantiate abuse allegations, such a disagreement alone is insufficient to establish intentional discrimination. Accordingly, the DCS Defendants are entitled to summary judgment on Plaintiff's ADA claim.

## IV. State Law Claims Against the DCS Defendants

Although not entirely clear from the allegations set forth in the Amended Complaint, we understand Plaintiff to be bringing state law claims against the DCS Defendants for conspiracy to deprive Shirley of her children without cause, failure to protect A.J. by not substantiating abuse allegations, and defamation, which Plaintiff contends ultimately caused Christopher to shoot and seriously injure her. The DCS Defendants argue that they are immune from each of these state law claims, pursuant to the Indiana Tort Claims Act ("ITCA"), Ind. Code §§ 34-13-3-1 *et seq.* Specifically, the DCS Defendants assert that they are entitled to immunity under § 34-13-3-3(8) (the adoption and enforcement or failure to adopt or enforce law); § 33-13-3-3(7) (the performance of a discretionary function); and § 33-13-3-3(10) (acts or omissions of persons other than the governmental entity or its employees).

Plaintiff's only response to this argument is that the DCS Defendants acted outside the course and scope of their employment and thus are not entitled to immunity under the ITCA. The sole evidence Plaintiff cites in support of this contention is a September 19, 2012 email string among DCS workers, dated September 19, 2012, in which Defendant Norris refers to Shirley as being "manipulative" and "a sociopath" and what appears to be an October 2012 service provider referral completed by an unidentified DCS employee that describes Shirley as "sneaky and manipulative." Exh. B, Exh. C to S. Justice Decl. Plaintiff argues that describing the parent of a potential victim of child abuse in such derogatory terms cannot be considered conduct within the scope of the DCS Defendants'

employment under the ITCA. Plaintiff points to no Indiana case law to support this conclusion, however.

To fall within the scope of employment under the ITCA, an employee's action "must be incidental to the conduct authorized or it must, to an appreciable extent, further the employer's business." *Myers v. Maxson*, 51 N.E.3d 1267, 1279 (Ind. Ct. App. 2016) (internal quotation marks and citation omitted). Assuming that the statements attributed to the DCS Defendants are admissible,[8] they were clearly made in the course of the September 2012 investigation into allegations that A.J. had been sexually abused and relate to the CHINS proceeding involving the Justice family. There can be no dispute that conducting investigations of abuse allegations and making assessments of the individuals involved in such allegations are activities entirely encompassed within the DCS Defendants' job duties and thus fall within the scope of their employment. Accordingly, we find that the DCS Defendants are entitled to immunity from Plaintiff's state law claims under the ITCA.

**V.    Remaining Pending Matters**

Having determined that all of Plaintiff's federal claims are subject to dismissal, we turn to the question of whether we should exercise supplemental jurisdiction over the remaining state law claims in this case. Plaintiff has brought defamation and invasion of privacy claims under Indiana law against Defendant Jennifer Bay Beinart and has also

---

[8] As discussed above in Footnote 6, the DCS Defendants challenge the admissibility of these exhibits. Because our consideration of the statements does not alter our ultimate analysis, however, we need not address this issue further.

sued Christopher Justice under state law theories.[9] "When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims." *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010). Although the presumption is rebuttable, "it should not be lightly abandoned, as it is based on a legitimate and substantial concern with minimizing federal intrusion into areas of purely state law." *RWJ Mgmt. Co., Inc. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012) (internal quotation marks and citation omitted). The Seventh Circuit has identified the following three situations in which a court should retain jurisdiction over supplemental claims, even though all federal claims have been dismissed: "where the statute of limitations would bar the refiling of the supplemental claims in state court"; "where substantial federal judicial resources have already been expended on the resolution of the supplemental claims"; and "where it is obvious how the claims should be decided." *Williams Elec. Games, Inc. v. Garrity*, 479 F.3d 904, 906-07 (7th Cir. 2007) (citations omitted).

Upon review of these factors, we find that the presumption in favor of remanding state claims has not been overcome here. This case was originally filed in state court and the DCS Defendants removed it on the basis of the complaint's federal claims pursuant to § 1983. Remanding the state law claims against Ms. Bays Beinart and Christopher as opposed to dismissing them with prejudice will satisfy any concerns related to statute of

---

[9] We note that it is unclear exactly what state law claims Plaintiff seeks to assert against Christopher. Her prolix, often incomprehensible Amended Complaint obscures both her claims as well as her intentions. We will not take on the challenge of making this determination. Whatever the claims are, they will be the responsibility of the state court to sort out.

limitations issues. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 351-52 (1988) (observing that remand may be preferable to dismissal without prejudice "when the statute of limitations on the plaintiff's state-law claims has expired before the federal court has determined that it should relinquish jurisdiction"). During the time this case has pended on our docket, no substantive rulings addressing the state-law claims have issued nor have significant judicial resources been otherwise dedicated specifically to their resolution. While the state law claims here may not be unusually complex, their identification, not to mention their resolution is not sufficiently obvious to justify resolving them in federal court. Accordingly, pursuant to 28 U.S.C. § 1367(c), we relinquish supplemental jurisdiction over all claims under state law asserted against Defendants Jennifer Bays Beinart and Christopher Justice and remand these claims to the Marion Superior Court.

## VI.    Conclusion

For the reasons detailed above, we <u>GRANT</u> the Motion for Summary Judgment filed by the DCS Defendants on all claims against them. The claims against Defendants Jennifer Higgins and Diane Elliott are likewise dismissed. Final judgment in favor of these Defendants shall issue accordingly. We relinquish supplemental jurisdiction over the remaining state law claims against Defendants Jennifer Bays Beinart and Christopher

Justice, which are hereby <u>REMANDED</u> to Marion Superior Court.  The Clerk of Court is hereby directed to effect this remand as promptly as possible.

IT IS SO ORDERED.

Date: _3/28/2018_

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution to counsel of record via CM/ECF